IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN J. FRIEDMAN and MICHAEL J. KREINER, | ) ) ) | |
| Plaintiffs, | ) ) | Case No.   22 C 2253 |
| v. | ) ) | |
| WOLFSPEED, INC., f/k/a CREE, INC., | ) ) | Judge Robert W. Gettleman |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Steven J. Friedman and Michael J. Kreiner sued defendants Ideal Industries, Inc. and their former employer Wolfspeed, Inc., f/k/a Cree Inc. in the Circuit Court of Cook County, Illinois, alleging breach of employment contract, violations of the Illinois Wage Payment and Collection Act ("IWPCA"), and violations of the Illinois Sales Representative Act against Wolfspeed.   The only claim brought against Ideal was for successor liability. Defendants removed the case to this court on the basis of diversity of citizenship, even though the complaint indicated that Friedman and Ideal are both citizens of Illinois.   Defendants' notice of removal argued that Ideal's "presence does not defeat diversity because it is improperly joined in this action," because there is no "reasonable possibility that a state court would rule against the non-diverse defendant."   Poulos v. Naas Foods, Inc., 959 F.2d 69 (7th Cir. 1992).   After removing the case, Ideal moved to dismiss for improper joinder [Doc. 8] and Wolfspeed moved to dismiss the count alleging a violation of the Illinois Sales Representative Act (Count III) [Doc. 10].   In response, plaintiffs voluntarily dismissed Counts III and IV, leaving only the breach of contract and violation of the IWPCA counts against Wolfspeed, the lone remaining defendant.

Defendant has moved for summary judgment on both counts.   For the reasons described below, the motion is granted.

## BACKGROUND

Prior to 2011 plaintiffs worked as a team at Security Lighting in Buffalo Grove, Illinois, selling lighting to national accounts.   Defendant was a vendor of Security Lighting. In late 2011 Tyrone Mitchell, defendant's general manager of LED lighting, and Craig Lofton, defendant's Vice President of Sales, met with plaintiffs at a restaurant in Illinois.   At the meeting they discussed defendant possibly employing plaintiffs.   After several further meetings in both North Carolina and Wisconsin, defendant presented each plaintiff with a separate written employment offer letter.   Plaintiffs retained counsel for the negotiations, and at least four drafts of the terms were exchanged.   Once both plaintiffs agreed upon a final version, each executed his individual offer.   Kreiner accepted the position of a Manager, National Accounts on August 13, 2012, with a base salary of $160,000.   Friedman accepted the position as a Director, National Accounts, with a base salary of $220,000.   Both letter agreements contained identical commission payment language:

> [Defendant] will pay you a commission on the invoiced sales price (before taxes, shipping and other added charges) of all shipped product which you are primarily responsible for selling directly to end customers.   Commission amounts will be calculated using the percentages shown below for each respective year in which the commission opportunity will be in effect . . . .

Each letter agreement indicated that no commission would be paid for sales after fiscal year 2018, the 6th year of the contract.   In addition, each agreement contained an identical chart listing the commission percentage to be paid each year.

2

Once they signed the agreements, plaintiffs joined defendant and formed what was called the Strategic National Accounts Team ("SNA"). For the first thirteen quarters of their employment (from their hire dates in 2012 through the first quarter of fiscal year 2016) plaintiffs worked the same accounts, soliciting sales from and calling upon customers together. During that time defendant paid both plaintiffs commissions on the invoiced sales price of all shipped products sold by them as a team. As a result, defendant was paying double the amount of commission than it would have if plaintiffs had worked individually.

Apparently unhappy with the then-current arrangement, either because plaintiffs' sales were disappointing or because it determined that it was paying plaintiffs too much, defendant decided that it did not make financial sense to continue to allow plaintiffs to attend client meetings together. On August 4, 2015, defendant informed plaintiffs that it had decided to individually assign customer accounts to each of them, allowing plaintiffs to divvy up the accounts they had been working together. Plaintiffs understood that they were to work independently to solicit sales and provide services to their individually assigned accounts. In addition. Plaintiffs were told that beginning October 1, 2015 (quarter two of fiscal year 2016) defendant would determine each plaintiff's commission based on the sales each generated on his individually assigned accounts. From quarter two of fiscal year 2016 through quarter four of fiscal year 2017 Friedman received total commissions of $207,462. In that same time period, Kreiner received total commissions of $229,133.

Unbeknownst to defendant, plaintiffs had entered a side agreement between themselves, in which they agreed, effective October 1, 2015, through June 30, 2018, that they would "continue to split 50/50 all earn out/commissions and bonuses earned irrespective of to whom the

commission/bonus is credited." They agreed to meet quarterly and to share all necessary and appropriate documentation to enable them to "settle up" with each other so that they received identical commission payments.

In the beginning of the first quarter of fiscal year 2018, plaintiffs asked defendant to combine their total sales, divided the sales in half, and pay each a commission based on the divided total sales. Defendant agreed and plaintiffs were compensated in this matter until, their employment was terminated on April16, 2019. They filed the instant lawsuit on February 17, 2022, claiming that once defendant split their team, they were each paid half of the commissions they were owed. They claim that each is owed $294,162.50 in commissions.

## DISCUSSION

Defendant has moved under Fed. R. Civ. P. 56 for summary judgment on both counts. Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden, and the court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). But the nonmovant must do more than raise "some metaphysical doubt as to the material facts." Id. at 586. Rather, the nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

Plaintiffs' first claim is that defendant breached the letter agreements when it stopped paying them commissions based on their "collective" sales after doing so for the first three years

4

of the six-year commission period.   The parties agree that the court should apply Illinois substantive law to this claim.

In Illinois, the basic rules of contract interpretation are well settled.   The primary objective in construing a contract is to give effect to the intention of the parties.   Thompson v. Gordon, 241 Ill.2d 428, 441 (2011).   The court first looks to the language of the contract itself to determine the intent of the parties.   The contract must be construed as a whole, viewing each provision in light of the other provisions.   Id.

"If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning."   Id.   If, however, the language of the contract is susceptible to more than one meaning, it is ambiguous.   If the contract language is ambiguous, the court can consider extrinsic evidence to determine the parties' intent.   Id.

Plaintiffs argue that the commission provision in each agreement is ambiguous, allowing the court to consider extrinsic evidence to determine the parties' intent.   That evidence, according to plaintiffs, is their understanding that they were brought on to work as a team and that they would each earn commissions for the sales made by the team as they did for the first three years of their employment.   In particular, they argue that because Friedman was a vice president and general manager at Security Lighting, the parties were concerned that they would be sued for breach of fiduciary duty if Friedman and Kreiner left at the same time to start a national accounts team at defendant.   According to plaintiffs, that is the reason there were separate offer letters with separate start dates, with no mention of "Friedman and Kreiner" or a "team" in either letter.   Because of the way the letters were drafted, plaintiffs were concerned that the letters were unclear as to how the commission was to be calculated.   They assert that

5

before signing they called Mitchell, who told them, "Look guys, we are going to bring you over as a team, and pay you each on the collective sales for these six years. After that, you will go to the regular program. Once you sign the letters, we are never going to need to look at them again."

Defendant disputes that Mitchell told plaintiffs that defendant would pay them each on collective sales, but more importantly argues that the court cannot consider the evidence because the commission provisions are clear and unambiguous. The court agrees.

To establish ambiguity, plaintiffs first argue that the plain meaning of the word "you" includes both the singular and plural tense, both the nominative and objective form. Thus, according to plaintiffs the phrase "[defendant] will pay you a commission on the invoiced sales price (before taxes, shipping and other added charges) of all shipped product which you are primarily responsible for selling directly to end consumers," is capable to being understood in at least two ways. First, plaintiff suggests that one possible meaning is that the company will pay a singular nominative employee for singular nominative sales. The second possible meaning, according to plaintiffs, is that the company will pay singular nominative employee for plural objective sales.

The court disagrees with plaintiffs that the use of the word "you" in the letters is ambiguous in any way. The letters are addressed to each plaintiff individually, and the word you is used in the singular form nearly 50 times in each. Construing the contract as a whole, viewing the commission provision in light of the other provisions, leads to the inescapable conclusion that the word "you" is used in the singular form only. The contract is not deemed ambiguous simply because the parties disagree on its meaning. Id. at 444.

Next, plaintiffs argue that the words "primarily responsible" are ambiguous, arguing that defendant reads the phase as meaning "singularly responsible," when the plain meaning of primarily is mainly or principally. Thus, according to plaintiffs, more than one person may be mainly responsible for a sale. Once again, the court disagrees.

As defendant points out, the broadly accepted definition of "primarily" is "essentially; mostly; chiefly; principally." Primarily, Dictionary.com, https:// dictionary.com /browse/primary (last visited Sept. 11, 2023). Thus, to be "primarily responsible" for something is to mostly, chiefly, or essentially be accountable for it. It strains reasonable interpretation in the context of the instant contract provision to suggest that the use of the phrase "shipped product for which you are primarily responsible for selling directly to end consumers" means anything but singularly responsible. Thus, as defendant argues, only the plaintiff assigned to an account was chiefly responsible for the sales made to that account.

As a result, the court concludes that the contract is unambiguous and neither parol nor extrinsic evidence is needed or appropriate to consider determining the parties' intent. Consequently, the court concludes that defendant did not breach the contracts and paid plaintiffs the commission to which they were entitled.

Finally, defendant is entitled to summary judgment on plaintiffs' IWPCA claim because the court has determined that defendant paid plaintiffs all they were due.

7

## <u>CONCLUSION</u>

For the reasons described above, defendant's motion for summary judgment [67] is granted.

**ENTER:**

Robert W. Gettleman
United States District Judge

**DATE:**     **September 11, 2023**

8